# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **DUQUIE SIMMONS,** | **Civil Action No. 14-2032 (FLW)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **STEPHEN D'ILIO, et al.,** | |
| **Respondents.** | |

## I.     <u>INTRODUCTION</u>

This matter has been opened to the Court by Petitioner Duquie Simmon's filing of a *pro se* petition for a writ of habeas corpus challenging his state court conviction pursuant to 28 U.S.C. § 2254.  For the reasons explained in this Opinion, the Court will deny the petition and will also deny a certificate of appealability.

## II.     <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

### a.  State Court Proceedings

Petitioner was convicted by a jury of first-degree aggravated manslaughter, N.J.S.A. 2C:11–4(a)(1); third-degree unlawful possession of a shotgun, N.J.S.A. 2C:39–5(c); and second-degree possession of a shotgun for an unlawful purpose, N.J.S.A. 2C:39–4(a) in connection with the shooting death of Harvey Garvin in Newark, New Jersey.  At sentencing, the court merged the conviction for possession of a shotgun for an unlawful purpose into the aggravated manslaughter conviction. Petitioner was sentenced to twenty-two years on the aggravated manslaughter conviction, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43–7.2, and a concurrent term of four years for unlawful possession of the shotgun.

1

Petitioner filed a notice of appeal and argued that his convictions were against the weight of the credible evidence and that his sentence was excessive. The Appellate Division affirmed his convictions and sentence in an unpublished opinion. The Supreme Court denied Petitioner's petition for certification, 200 N.J. 371 (2009).

Petitioner filed a PCR petition on February 17, 2010, in which he argued that (1) he was denied the effective assistance of trial counsel because his attorney: failed to object to the prosecutor's reference in summation to a "Stop Snitching" campaign; (2) failed to file a notice of alibi and investigate his alibi defense; and (3) failed to obtain records relating to the release of a witness for the prosecution. He also argued that he was denied the effective assistance of appellate counsel because these issues were not raised in the direct appeal. (*See* ECF No. 7-15, Petitioner's Pro Se Supplemental Letter Brief on PCR.) A brief and amended petition were submitted on behalf of Petitioner by designated counsel who argued that Petitioner had presented prima facie evidence of ineffective assistance of counsel, warranting an evidentiary hearing. (*See* ECF No. 7-15, Letter Brief in Support of PCR at 99-112; *see also State v. Simmons*, No. A-4423-10T2, 2013 WL 949526, at *1 (N.J. Super. Ct. App. Div. Mar. 13, 2013.) The facts related to his grounds for relief on PCR are recounted below.

1. **Facts related to Prosecutor's Mention of "Stop Snitching" Campaign in Summation**

On the afternoon of January 17, 2006, Eddie Chavis and Harvey Garvin were selling marijuana on 13th Street in Newark. While there, Chavis witnessed Petitioner shoot Garvin in the leg with a shotgun at close range. At the time of the shooting Chavis had known Petitioner for approximately seven or eight years. Upon being shot, Garvin said to Chavis: "Shit I don't believe he just-I don't believe this mother fucker just shot me." As Garvin limped away, he said additionally: "I don't believe Duquee just shot me." Shahada Smith, a resident of a nearby

apartment who knew Petitioner, Garvin, and Chavis, heard the shot but did not witness the

shooting. She testified at trial that she heard Garvin say "call the ambulance, Duquee just shot

me." Smith called 911 and was instructed by the operator to attempt to staunch the flow of

blood, which she sought to do by applying pressure with the use of towels. However, Garvin

soon lapsed into unconsciousness and later died of blood loss from a severed femoral artery.[1]

In their initial statements to the police, Chavis and Smith failed to implicate Petitioner as

Garvin's shooter, and Smith failed to mention that Chavis was present. The discrepancies in

their respective statements are succinctly summarized by the New Jersey Appellate Division in

its opinion denying Petitioner's direct appeal:

> On February 1, 2006, the police came to Chavis's house,
> and Chavis gave a statement to them. In that statement, Chavis
> mentioned that a red Jeep had pulled up next to Garvin. However,
> he stated that he did not know who was in the Jeep, and he did not
> mention that he had witnessed the shooting, stating only that he
> heard the shot. Chavis did not speak to the police or prosecutors
> further until he was jailed for failure to pay child support, in or
> around June 8, 2007. At that time, Chavis admitted to having seen
> the shooting and he identified defendant as the shooter. However,
> he declined to give a statement and he declined to sign the back of
> a photograph of defendant that was shown to him by the
> prosecutor. It was only after Chavis fulfilled his support
> obligations and was released from jail that he admitted to the
> prosecutor, on June 11, 2007, that he had seen Duquee initially
> point his shotgun at the upper part of Garvin's body, lower it to his
> thigh area, and then shoot. Additionally, at that time, he identified
> a photograph of Duquee as the shooter.

> With respect to Smith, defendant notes that in her first
> statement on January 17, 2006, the day of the crime, she did not
> mention Chavis, whom she had known for three to four years as a
> relative of her son's father; she did not disclose the circumstances
> surrounding Garvin's shooting; and she did not reveal the fact that
> Garvin claimed to have been shot by Duquee. She did so only in a
> second statement given two months later on March 16, 2006. At

---

[1] This overview is taken from the New Jersey Appellate Division's decision denying Petitioner's
direct appeal. *See State v. Simmons*, No. A-2544-07T4, 2009 WL 1586509, at *1 (N.J. Super.
Ct. App. Div. June 9, 2009).

> that time, she mentioned Garvin's statement incriminating Duquee, and she identified photographs of both Duquee and Chavis. However, on cross-examination she admitted that she had contacted the police only after learning that they were looking for her. Further, at trial, Smith was reluctant to state whether Chavis was selling drugs with Garvin, stating that she really did not know whether Chavis was doing so.

*Simmons*, 2009 WL 1586509, at *2. Petitioner also claimed that there was a contradiction between Chavis' testimony that he did not discuss the incident with Smith and Smith's testimony that she had spoken to Chavis in the days following the shooting; Smith, however, did not specify the nature of their conversation.[2] *Id.*

At trial, both Smith and Chavis offered explanations for why they failed to implicate Petitioner in their initial statements to police. Smith testified that she did not implicate Petitioner, stating that "at that time I was afraid." (ECF No. 7-3, Exhibit 3, Trial Tr. dated Jun. 25, 2007 at 55:13.) She further stated: "I just afraid of anything. Like, just knowing what happened, what Harvey told me and being as though I know Duquee, or whatever, I really didn't want to believe that he did that to Harvey." (*Id.* at 55:23-56:1.) Chavis testified that when the police arrived on the scene, they told him to remain there to provide details of the shooting (ECF No 7-4, Exhibit, 4, Trial Tr. dated Jun. 26, 2007 at 35:12-19). Instead, Chavis got into his car

---

[2] Petitioner's direct appeal argument that the verdict was against the weight of the evidence also focused on the testimony of Chavis and Smith. The New Jersey Appellate Division quoted from his argument as follows:

> The evidence inculpating the defendant in this case consisted, in its entirety, of the testimony of two witnesses, only one of whom claimed to have witnessed the actual shooting, and who both testified as to the victim's purported identification of the defendant as the shooter immediately after he was shot. And, the defendant submits, as he did before the trial court, that each of these witnesses was so inherently unbelievable that to rest a conviction upon their testimony constitutes an 'obvious jury error.'

*Simmons*, 2009 WL 1586509, at *1. Petitioner does not raise this argument in his habeas petition.

and left because he was "scared" (*Id.* at 35:21-25). When the police later came to him on February 1, 2006, he still failed to acknowledge that he saw the shooting. He told the police that the victim said that Duquee shot him, but did not admit actually seeing the shooting. He said, "(c)ause I ain't want to get involved" (*Id.* at 38:3.) Chavis also testified that on the day of the shooting, January 17, 2006, he had been out on the street selling drugs with Garvin. (*Id.* at 10:4-8, 11:6-25.)

As expected, defense counsel thoroughly cross examined both witnesses on their inconsistent statements. In summation, defense counsel focused almost exclusively on the credibility of Chavis and Smith, arguing that they were not credible witnesses and should not be believed by the jury:

> The reason I'm going into this is because my basic argument is that you cannot reliably believe anything that either of those two witnesses say other than how it's corroborated.

(ECF No. 7-5, Exhibit 5, Jun. 27, 2017 Tr. at 56-20 to 23.)

> So, [Smith] says she sees him, I guess, coming from the car outside. She went to the window. He was coming up the stairs. He said to call an ambulance.
>
> Now, that's all she says . . . .

(*Id.* at 60-17 to 20.)

> Now, let's look at her second statement. Because for one thing, there's absolutely no question when you look at the sum and totality of Ms. Shahadah Smith, she was untruthful. She lies. What did she lie about? I'm going to talk about what she lied about, and ultimately I'm not sure if we're ever going to know how much was the lie and how much was the truth

(*Id.* at 62-63-6.)

> What transpires between March 16, 2006 when the police are looking for her and she eventually goes down that and acknowledges, well, I left something out. What did you leave out? Oh, well, Mr. Gavin not only said call an ambulance, he said Duquee shot me. So that's one big thing.

(*Id.* at 64-12 to 15.)

Now, [Chavis] gives his first statement what does he say? In short, he says, well, I was out there but I really didn't see anything

(*Id.* at 65-24 to 66-1.)

[Chavis'] second statement 15 months later. Let's stick with the first one, because the first one bears relationship to his lies, because he is a liar, he is untruthful. The first and second statement couldn't have existed the same way at the same time as being truthful, nor could Shahada Smith's first [] and second statement

(*Id.* at 67:20-68:2.)

Just on truthfulness alone, you know that [Smith], her testimony here in Court and her inconsistent statements, she is lying and I submit to you the only statement that has any corroboration is her first statement where she mentions none of this. This has been cooked up between [them], I submit, between them and others in the family.

(*Id.* at 68:17-23.)

Now, let's look at Mr. Chavis. He says some remarkable things. In his first statement he says what I told you, that he is in the back of the building. He hears actually what he says is this, the red Jeep. He sees the red Jeep pull up. He is going in the back of the building. He is not interested in the red Jeep. He is in the back of the building. He hears voices. One of them is Harvey's voice, another voice he hears is not loud, not arguing, brief conversation. He hears a shot, comes around. The Jeep had tinted windows. He didn't see anyone in the Jeep because of the tinted windows, and, of course, he was in the back. If any of the windows opened up, he didn't see that and he sees Harvey and Harvey says, "I don't believe that mother fucker just shot me," and then he says "Duquee shot me." That's where I suggest to you where [Smith's] second statement comes from. That's why they are both putting Duquee in it.

Actually Mr. Chavis is the kind of guy who is not only a liar, he is 42 years old, convicted felon, and one of the things you have to evaluate with regard to his convictions . . . . it's not that he's a bad person. It's that a person who violates the law may be entitled, and it's up to you, to less credibility than others.

(*Id.* at 69:7-70:9.)

In his summation, the prosecutor emphasized that both witnesses were afraid to come forward, as they stated in their respective testimony, and also stated the following regarding the "stigma . . . in the community" associated with being a witness in a homicide case:

They are telling you the truth as to who did this. She doesn't tell everything, and I told you in my opening Mr. Chavis didn't tell everything either, but think about how hard it is to be a witness in a homicide case. There's always a stigma attached to it in the community.

We just took a class and it was interesting and in some city of Pittsburgh, for example, there's a whole thing going on where they have T shirts that say "Stop Snitching" on them with a big red stop sign on it. That's the culture. So people, besides the fact that they are scared to death because they just witnessed a violent act by someone they know from the area, but there's also a stigma attached when you come to court. You have to have courage to come to court. And I submit to you, ultimately both those witnesses got up the gumption to come to this Court and tell you what actually happened.

(*Id.* at 89:12-23.) Petitioner's counsel did not object to the prosecutor's comments regarding the "Stop Snitching" campaign.

Petitioner sought relief on PCR, alleging that his defense counsel was ineffective for failing to object to the prosecutor's comments regarding the "Stop Snitching" campaign and that his appellate counsel was deficient for failing to raise the issue on direct appeal. The PCR court rejected Petitioner's claim as follows:

[W]ith regard to the T-shirts that say stop snitchin', the prosecutor made a fleeting reference to T-shirts that said stop snitchin'. This was not a reference to the facts outside the reference – record, rather, but rather, a general reference to something, a climate that existed in big cities. And counsel for the state cites *State v. Byrd*, B-Y-R-D, at 198 N.J. 319, 2009, that notes that in – there's a nationwide pandemic in – in – in terms of witnesses coming forward in criminal cases who are afraid to testify.

So the court finds that in the context of the closing statement made by [the prosecutor] to explain the difference between the statements made by [Smith] and – and – and [Chavez], that it was not impermissible for [the prosecutor] to make that inference in his closing argument. Counsel for the state is entitled to make a vigorous closing statement and he did so in connection with this case. The court finds that the reference to stop snitchin', which was a fleeting reference in the summation, is not error. But even if it were error, it clearly would not be error that would entitled the

> defendant to post-conviction relief.  That is just not capable of
> producing an unjust result.

(*See* ECF No. 7-9, Exhibit 9, PCR Transcript dated November 9, 2010, at 24:2-25:1.)

The Appellate Division applied a procedural bar to this claim pursuant to N.J. Ct. R.

3:22-4:  "Defendant's allegation that his trial counsel was ineffective in failing to object to the

prosecutor's summation is thus procedurally barred by Rule 3:22–4(a) unless: this argument

could not reasonably have been raised in the direct appeal; enforcement of the procedural bar

would result in a fundamental injustice; or denial of relief would be contrary to a new rule of

constitutional law. We are satisfied that none of these exceptions to the procedural bar apply."

*Simmons*, 2013 WL 949526, at *2.

## 2.  Facts Related to Petitioner's Alibi Defense

On PCR, Petitioner alleged that on the day of the homicide, he was with his then

girlfriend, Veronica Johnson, who would have testified that he was with her for the entire day

and was not responsible for the shooting.  (*See* ECF No. 7-15, Petitioner's Brief on Appeal of

Denial of PCR at 20-21; Petitioner's Pro Se Supplemental Brief on PCR at 8-9.) On PCR,

Petitioner contended that his trial counsel was ineffective for failing to file a notice of alibi and

investigate his alibi defense.  (*See id.*)

Because Petitioner lacked evidentiary support for his alibi claim, the PCR court

adjourned the case for approximately two months to allow Petitioner extra time in which to

secure some competent evidence in support of that claim.  (*See* ECF No. 7-9, Exhibit 9 to

Respondent's Answer, PCR Transcript dated November 9, 2010, at 4:24-5:6).  At the hearing on

November 9, 2010, after the two month period had lapsed, Petitioner's counsel and the PCR

judge had the following exchange:

> Mr. Hesketh:   Judge, despite great efforts on I guess everybody's
> part, we actually did get a chance to, um, I spoke to Mr. Chavez.  I

was unable to speak with Veronica Johnson, but Mr. Simmon's family was in touch with her. Um, Judge, at this point in time, they're just, um, a little reluctant to come forward and give a statement. So I couldn't . . .

The Court:  There's nothing more to be – to be presented –

Mr. Hesketh:  Yeah.

The Court:  -- to the court –

Mr. Hesketh:  No.

The Court:  -- on that issue –

Mr. Hesketh:  There's nothing more to be added.

(*Id.* at 5:19-6:8.)

The PCR court then noted that in a pretrial hearing, the court had inquired on the record, with both defense counsel and the Petitioner present, if there were any alibi witnesses and if a notice of alibi had been served (*See id.* at 7:3-17). Defense counsel stated in open court in front of Petitioner that he discussed this with his client, and there was no notice of alibi and that Petitioner never protested this statement. (*Id.*)

The transcript of that hearing reflects the following colloquy:

THE COURT: Okay. How about alibi witnesses or tailor - - tailored notice of defense? Has a notice of alibi been served?

MR. KAPALIN: There has not been a notice of an alibi and I have discussed that with my client.

THE COURT: Okay. And how about notice of any peculiar defenses? When I say peculiar, I mean out of the ordinary such as renunciation, insanity, duress, anything like that.

MR. KAPALIN: There is none of that, Judge.

THE COURT: No. No tailored defenses. Now, I've received a witness list from Mr. Zuckerman, which I intend to read to the jury. It includes the name of Stacy Marshall on it. You've seen a copy of that witness list, correct, Mr. Kapalin?

MR. KAPALIN: Yes, I have.

THE COURT: So, therefore, there's no additional witnesses that I need to add to that list; correct?

MR. KAPALIN: That's correct.

(Exhibit 7-1, Exhibit 1, Trial Tr. dated June 19, 2007, at 15:23-16:17.)  At the time of the trial, the court specifically inquired of the Petitioner if he had sufficient opportunity to speak with his attorney and whether he had answered all of the Petitioner's questions specifically related to his own decision not to testify, and Petitioner indicated that he had sufficient discussion with his attorney (ECF No. 7-5, Exhibit 5, Trial Tr. dated June 27, 2007, at 45:7-18.)

With respect to the claim that trial counsel inadequately investigated the alibi claim, the PCR court found at the hearing that the first prong of the *Strickland* test was not met:

> Here, the defendant has supplied no affidavits, certifications, or other competent evidence supporting his claim that counsel inadequately investigated his case.  The claim here is that there might have been alibi witnesses available for the defendant, but the court has nothing before it to show that such alibi witnesses existed or what they would testify to in connection with this case.  The court even adjourned this [PCR] application for – for two months in order to allow counsel further time to investigate whether there was witnesses available that would support an alleged alibi defense, and none are forthcoming.  So, the court honestly finds that the first count of the – first prong of the Strickland test is not met with regard to the alibi witnesses, and that is that there is no showing that counsel's performance was deficient in that regard.

(ECF No. 7-9, Exhibit 9 at 23:10-24:1.)

The New Jersey Appellate Division likewise found that Petitioner's claim failed because he had not supported his assertion that he had a viable alibi defense:

> Defendant also argues that he was entitled to an evidentiary hearing on his claim that his trial attorney was ineffective in failing to investigate and present an alibi defense. Defendant contends he told his trial attorney that the day in question was the day he proposed to his fiancé, Veronica Johnson; that they spent the day together, went to the movies, and returned home where he cooked dinner for them. However, defendant has failed to support his assertion that he had a viable alibi defense with any certification from Ms. Johnson.
>
> In order to be entitled to an evidentiary hearing, a defendant "must do more than make bald assertions that he was denied the effective assistance of counsel." *State v. Cummings*, 321

N.J. Super. 154, 170 (App. Div.), *certif. denied*, 162 N.J. 199
(1999). Rule 3:22–10(c) provides: Any factual assertion that
provides the predicate for a claim of relief [in a petition for PCR]
must be made by an affidavit or certification ... and based upon
personal knowledge of the declarant before the court may grant an
evidentiary hearing. Thus, when a defendant asserts that his
attorney failed to call witnesses who would have exculpated him,
he must assert the facts that would have been revealed, "supported
by affidavits or certifications based upon the personal knowledge
of the affiant or the person making the certification." *State v.
Petrozelli*, 351 N.J. Super. 14, 23 (App.Div. 2002) (quoting
*Cummings, supra*, 321 N.J. Super. at 170). Defendant's failure to
support his assertion with such an affidavit here defeats his
argument that he is entitled to an evidentiary hearing on this issue.

*Simmons*, 2013 WL 949526, at *2-3.

### 3. Facts Related to Alleged Agreement between Chavis and the Prosecution

On PCR, Petitioner argued that his counsel was ineffective for failing to pursue release

records of Chavis and to expose a cooperation agreement between Chavis and the prosecution.

(*See* ECF No. 7-15, Petitioner's Pro-Se Supplemental Brief on PCR at 11-15.)

At trial Chavis testified that the prosecution was not involved in his

release from county jail. He testified as follows on direct:

Q.      Okay. Now, I'm going to take you to June of this year. Did
there come a time when you spoke to me and two of my
investigators?

A.      Yes.

Q.      And do you remember about when that was?

A.      June 8th.

Q.      Around June 8th?

A.      Yes.

Q.      And did you - - where were you when we spoke to you?

A.      In the county jail.

Q.      And what was the reason you were in the county jail?

A.      Paying arrears - - for not paying arrears on my child
support.

Q.      Did you subsequently get released from the county jail?

> A.     Yes.
>
> Q.     Did we have anything to do with the fact that you got released on that matter?
>
> A.     No, you didn't.
>
> Q.     Okay. Now, at that point in time did you indicate to the detectives and myself whether or not you had actually seen the shooting?
>
> A.     Yes.
>
> Q.     And what did you indicate?
>
> A.     I told you what happened.

(ECF No. 7-4, Exhibit 4, Trial Tr. dated June 26, 2007, at 39:12-40:13.) According to Mr. Chavis, he finally told the whole story because, "Harv ain't deserve what happened to him" (*Id.* at 41:4-5.) According to his testimony, after Mr. Chavis satisfied his child support obligation, members of the Prosecutor's Office picked him up upon his release from jail and took his formal statement, at which time Mr. Chavis identified the Petitioner's photograph as the shooter and signed it as well. (*Id.* at 57:1-23.)

It also appears from the PCR hearing transcript that during the two-month adjournment, Petitioner and his PCR attorney sought to investigate the issue of whether there was an undisclosed cooperation agreement. PCR counsel stated that he actually spoke to Mr. Chavis, who was reluctant to make any statement on Petitioner's behalf. (*Id.* at 5:21-25.)

In reviewing the claim, the PCR court noted that defense counsel questioned Mr. Chavis about his release and addressed the issue of his being in jail when the police came to speak with him. (ECF No. 7-19:18-23.) In his summation, defense counsel argued at length about the coincidence of the witness being in the jail on June 6th, when the prosecutor came to speak with him on June 7th, and two prosecutor investigators waited for him on June 11th, the day of his release (ECF No. 7-5, Exhibit 5, 78:10-22.) Counsel argued that the witness would say anything he could to help himself (*id.* at 79:1-16), which affected his credibility (*Id.* at 79:23-80:10.) The

PCR judge found that there was no evidence of any cooperation agreement between Mr. Chavis and the State, noting that the issue was still placed before the jury very clearly by defense counsel. (ECF No. 7-9, 25:23- 26.) The PCR court further stated:

> Moreover, the fact that the prosecutors picked him up from the Essex County Jail and transported him to make his statement after he was released where he was held because of family court arrearages, had nothing to do with the prosecutor's office. That issue was fairly and fully and completely aired out in front of the jury. And the court finds that there was no error on the part of [defense counsel] in failing to investigate that further.

(*Id.* at 26:2- 11).

The New Jersey Appellate Division noted that Petitioner raised this issue on PCR, but stated in a footnote that Petitioner did not raise the issue on appeal. *See Simmons*, 2013 WL 949526, at *1 (explaining that "[t]he State denied there was 'any deal' between the State and the witness in question in opposing defendant's petition. Defendant has not raised this argument on appeal").

### b. Habeas Proceedings

Petitioner's habeas Petition, which is dated March 25, 2014, was docketed on March 31, 2014. (ECF No. 1.) Respondent submitted its Answer to the Petition on July 7, 2014. Petitioner did not submit a traverse. The matter is fully briefed and ready for disposition.

### III. <u>STANDARD OF REVIEW</u>

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Anti–Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in

habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts.  *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus. The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated petitioner's federal claim on the merits,[3] a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)). The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits.  *See Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

---

[3] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the claim, and 2) resolves th [at] claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405–06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413. With regard to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005). Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To

do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, however, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See id.* (citing *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Id.* at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)). Finally, if a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Id.* at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that Petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) ("Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

IV. <u>ANALYSIS</u>

The instant Petition presents three grounds for relief:

**GROUND ONE: Petitioner was Denied the Effective Assistance of Trial Counsel in Violation of the Sixth Amendment to the United States Constitution when Counsel's Fail[ed] to Pose an Objection to the Prosecution's Reference to the "Stop Snitching Campaign" Which, Among Other Things, Amounted to Bolstering the Credibility of State's Witnesses**

**GROUND TWO: Petitioner was Denied the Effective Assistance of Counsel in Violation of the Sixth Amendment to the United States Constitution [by] Counsel Failure to File a Notice of Alibi and Investigate Petitioner's Alibi Defense**

**GROUND THREE: Petitioner was Denied the Effective Assistance of Trial Counsel in Violation of the Sixth Amendment to the United States Constitution [by] Counsel's Failure to Pursue Release of State's Witness, Eddie Chavis and to Expose the Release Agreement Offered for his Testimony.**

(ECF No. 1, Pet. at 6-17.) Each of Plaintiff's grounds for relief allege ineffective assistance of trial and/or appellate counsel.[4]

The standard which governs claims of ineffective assistance of counsel is well established; such claims are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a

---

[4] With respect to Ground One, Petitioner also argued that procedural default should be excused due to the ineffectiveness of appellate counsel. (Pet. at 9.) To the extent that Petitioner's claims are procedurally defaulted and/or unexhausted, as argued by Respondent, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). *See Bronshtein*, 404 F.3d at 728 ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit. Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here"); *see also Samelson v. Warren*, No. CIV.A. 11-853 RMB, 2012 WL 893027, at *1 (D.N.J. Mar. 15, 2012) (explaining same).

petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299. In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, the petitioner must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002); *Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Finally, when a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (internal quotation marks omitted) (emphases in original). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

### a. Ground One – Reference to "Stop Snitching" Campaign in Prosecutor's Summation

The Petitioner on his PCR, and in this Petition for habeas corpus, claims that his trial and appellate counsel were ineffective for failing to object to the prosecutor's summation and to raise the issue on appeal. In response to defense counsel's argument that the State's witnesses were liars because they failed to come forward and implicate the Petitioner earlier, the prosecutor referenced the fact that urban witnesses are reluctant to come forward because of a stigma in the community against assisting a prosecution. Petitioner claims that the issue went beyond proper comments in summation and was used to bolster the credibility of Smith and Chavez.

Because a prosecutor's duty is to see that justice is done rather than to secure convictions, prosecutors are bound to "refrain from [the use of] improper methods calculated to produce a

wrongful conviction" and thus, while a prosecutor "may strike hard blows [during his summation], he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). A criminal conviction, however, "is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985). Thus, a prosecutor's improper comments during summation will only warrant relief where those comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n.5 (3d Cir. 2012).

Petitioner's claim that the prosecutor attempted to bolster the credibility of Smith and Chavis through the reference to the "Stop Snitching" campaign implicates a subspecies of prosecutorial misconduct known as improper vouching or bolstering. Under New Jersey law, a prosecutor may neither personally vouch for a witness nor refer to evidence beyond the record to support a witness's credibility. *State v. Walden*, 370 N.J. Super. 549 (App. Div.), *certif. denied*, 182 N.J. 148, 862 A.2d 56 (2004). Thus, a prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility. *State v. Scherzer*, 301 *N.J. Super.* 363, 445, 694 A.2d 196 (App. Div.), *certif. denied*, 151 N.J. 466 (1997). *See also State v. Staples*, 263 N.J. Super. 602, 605, 623 A.2d 791 (App. Div.1993) (prosecutor may not express a personal belief or opinion regarding the truthfulness of his or her witness's testimony); *State v. Frost*, 158 N.J. 76, 727 A.2d 1 (1999) (improper for prosecutor to imply that police had no motive to lie).

In summation, prosecutors are permitted to make a "vigorous and forceful presentation of the State's case [,]" but are nevertheless limited to "commenting on the evidence and to drawing any reasonable inferences supported by the proofs[.]" *State v. Dixon*, 125 N.J. 223, 259 (1991) (quoting *State v. Bucanis*, 26 N.J. 45, 56, *cert. denied*, 357 U.S. 910 (1958)). Thus, as long as their comments are reasonably related to the scope of the admissible evidence presented during the trial, prosecuting attorneys are afforded considerable leeway in making their summations. *State v. Harris*, 141 N.J. 525, 559 (1995). Furthermore, prosecutors may respond when the credibility of their witnesses are attacked by the defense. *State v. Hawk*, 327 N.J. Super. 276, 284 (App. Div. 2000). Finally, alleged improper remarks made in summation must be judged in context. *State v. Vasquez*, 374 N.J. Super. 252, 262 (App. Div. 2005).

Allegations of prosecutorial misconduct require reversal only if the misconduct is "so egregious that it deprived the defendant of a fair trial." *State v. Jackson*, 211 N.J. 394, 409 (2012) (quoting *State v. Frost*, 158 N.J. 76, 83 (1999)). A reviewing court should consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." *State v. Ramseur*, 106 N.J. 123, 322–23 (1987). Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made and also deprives the court of an opportunity to take curative action. *State v. R.B.*, 183 N.J. 308, 332–33 (2005).

Here, the PCR court found that there was no misconduct or improper statement, as the prosecutor's comments were fleeting, and were made in the context of responding to defense counsel's summation. And, if, arguendo, there were error, the comments did not rise to level of

plain error because they were not capable of producing an unjust result. (*See* ECF No. 7-9, Exhibit 9, PCR Transcript dated November 9, 2010, at 24:2-25:1.)

The Court agrees. The reference to the "Stop Snitching" campaign was a direct response to defense counsel's arguments, which attacked the credibility of Smith and Chavis based on their initial failures to mention Petitioner's involvement in the shooting. Given the wide latitude afforded to prosecutors in summation, the Court finds that this single reference did not amount to prosecutorial misconduct when viewed in context; in turn, defense counsel was not deficient for failing to object to the reference.[5] And, even if defense counsel were deficient for failing to object to the prosecutor's reference to the "Stop Snitching" campaign, the reference was not so egregious to deny Petitioner a fair trial under the circumstances of Petitioner's case, where the reference was fleeting and not likely to have any impact on the jury's assessment of the witnesses' credibility in the context of the trial as a whole. *See, e.g.*, *United States v. Zehrbach*, 47 F.3d 1252, 1266–67 (3d Cir. 1995) (a brief "improper and irrelevant" remark that "sought to influence the decision of the jury on an illegitimate basis" did not amount to a due process violation because "the comments at issue were but two sentences in a closing argument that filled forty pages of transcript"); *Echols v. Ricci*, 492 F. App'x 301, 314 (3d Cir. 2012) (finding that brief improper reference to juror safety in prosecutor's opening was insufficient to warrant reversal). As such, the Court will deny relief on Ground One.

**b. Ground Two – Failure to Investigate Alibi Defense**

The Petitioner on his PCR, and on this petition for a writ of habeas corpus, claims that his trial attorney was ineffective for failing to file a notice of alibi and investigate his alibi defense. "It is a hallmark of *Strickland* that "counsel has a duty to make reasonable investigations or to

---

[5] Likewise, appellate counsel was not deficient for failing to raise the issue on direct appeal.

make a reasonable decision that makes particular investigations unnecessary." *Moore v. Sec'y Pennsylvania Dep't of Corr.*, 457 F. App'x 170, 182 (3d Cir. 2012) (citation omitted).

Under New Jersey law, however, "[a] defendant shall be entitled to an evidentiary hearing only upon the establishment of a *prima facie* case in support of post-conviction relief[.]" R. 3:22-10(b). "To establish such a prima facie case, the defendant must demonstrate a reasonable likelihood that his or her claim will ultimately succeed on the merits." *State v. Marshall*, 148 N.J. 89, 158, *cert. denied*, 522 U.S. 850 (1997). In order to be entitled to an evidentiary hearing, a defendant "must do more than make bald assertions that he was denied the effective assistance of counsel." *State v. Petrozelli*, 351 N.J. Super. 14, 22–23 (App. Div. 2002) (citing *State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div.), *certif. denied*, 162 N.J. 199, 743 A.2d 852 (1999)); *see also State v. Jones*, 219 N.J. 298, 311–12 (2014) (explaining same). Instead, a petitioner "must allege facts sufficient to demonstrate counsel's alleged substandard performance" and the probability that it affected the jury's verdict. *Id.* "[W]hen a petitioner claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification." *State v. Porter*, 216 N.J. 343, 353 (2013) (citing *Cummings*, 321 N.J. Super. at 170 (citing R. 1:6–6)); *see also Petrozelli*, 351 N.J. Super. at 22–23 ("Where . . . the defendant asserts that his attorney failed to call witnesses who would have exculpated him, he must assert the facts that would have been revealed, 'supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification.'"). "In that context, [an appellate court] consider[s] petitioner's contentions indulgently and view[s] the facts asserted by him in the light most favorable to him." *Id.*

Here, Petitioner contended on PCR that on the day of the homicide, he was with his then girlfriend, Veronica Johnson, who would have testified that he was with her for the entire day and not responsible for the shooting, but he failed to provide to the PCR court a certification or affidavit from Johnson or other competent evidence that explained her proposed testimony. Nor did Petitioner provide any evidence suggesting that defense counsel was aware of the potential alibi but declined to investigate, an allegation that is belied by the trial record. The New Jersey Appellate Division was unpersuaded by Petitioner's alibi claim and found that the failure of the Petitioner to provide any affidavit or certification in support of the claim, meant there was no *prima facie* claim presented, and no evidentiary hearing was required. *See Simmons*, 2013 WL 949526, at *2-3.

This Court has carefully reviewed the state court record, and finds that the New Jersey courts' rejection of Petitioner's alibi claim was not contrary to, or an unreasonable application of *Strickland* and its progeny. Although Petitioner was provided with a two month adjournment to investigate the alibi defense, he provided no evidence to show that a true alibi defense existed. In affirming the PCR court's rejection of Petitioner's alibi claim, the Appellate Division did not unreasonably apply *Strickland*, and the Court will therefore deny relief on Ground Two.

### c. Ground Three – Failure to Investigate the Alleged Cooperation Agreement

The Petitioner on PCR, and in this petition, claims that his trial attorney was ineffective for failing to pursue an alleged agreement for the release of the state witness, Tyrone Chavis, in exchange for his testimony. On PCR, the Petitioner hypothesized that because the prosecutor's staff escorted the Chavis from the jail, there must have been some participation by the prosecutor in effectuating the Chavis' release. By extension, this benefit of release must have precipitated Chavis' incriminating Petitioner. The Appellate Division determined that Petitioner did not raise this claim on appeal, and thus the claim appears to be unexhausted. *See Simmons*, 2013 WL

949526, at *1.  Even if Petitioner had exhausted this claim, it would fail on the merits for the same reason his alibi claim fails.  Although Petitioner was provided with a two-month adjournment of his PCR to investigate this claim, he did not provide an affidavit from Chavis or any other competent evidence of the alleged cooperation agreement between Chavis and the prosecution.  Because his hypothesis is entirely speculative, he fails to raise a *prima facie* claim of ineffective assistance of counsel.  As such, the Court will deny habeas relief on Ground Three.

### a.  The Court will Deny a Certificate of Appealability

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  For the reasons expressed above, jurists of reason could not disagree that Petitioner's claims are lacking in merit.  Therefore, no certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c)(1)(B).  *See* Fed. R. App. P. 22(b)(1); 3d Cir. L.A.R. 22.2.

## V.    CONCLUSION

For the reasons expressed in this Opinion, the Court denies the Petition and denies a certificate of appealability.  An appropriate Order follows.

/s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.

Date: April 27, 2017